IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.  Criminal No. 2:21-cr-00216-CCW-1

ORONDE SHELTON

**DEFENDANT'S MOTION TO DISMISS 922(o) CHARGE**

AND NOW COMES Defendant, Oronde Shelton, by and through his attorney Paul Jubas, Esquire, and respectfully asserts the following in support of his Motion to Dismiss 922(o) Charge:

In 2008 the Supreme Court used the *Heller* case to form a broad pillar of Second Amendment jurisprudence. *District of Columbia v. Heller*, 554 U.S. 570. District Courts have found a framework for analyzing cases involving machine gun possession (18 U.S.C. § 922(o)) within *Heller's* dicta.

In *Heller*, the Supreme Court held that a handgun ban and trigger lock requirement (as applied to self-defense) violate the Second Amendment. *Id*. at 2786. They qualified that holding, by stating that:

> Like most rights, the Second Amendment right is not unlimited. It is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose: For example: concealed weapons prohibitions have been upheld under the Amendment or state analogues. *See, e.g., State v. Chandler*, 5 La.Ann. at 489-490; *Nunn v. State*, 1 Ga., at 251; (citations omitted). Although we do not undertake an exhaustive historical analysis today on the full scope of the Second Amendment, nothing in our opinion should be taken to case doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. *Miller's* holding that the sorts of weapons protected are those "in common use at the time" finds support in the historical tradition of prohibiting the carrying of dangerous and unusual weapons. Pp. 2816-2817.

*Id*.

*Heller's* dicta delved further into its discussion of "common use", noting:

> We may as well consider at this point (for we will have to consider eventually) what types of weapons *Miller* permits. Read in isolation, *Miller's* phrase "part of ordinary military equipment" could mean that only those weapons useful in warfare are protected. That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional, machineguns being useful in warfare in 1939. We think *Miller's* "ordinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." 307 U.S. at 179, 59 S.Ct. 816. The traditional militia was formed from a pool of men bringing arms "in common use at the time" for lawful purposes like self-defense… We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. That accords with the historical understanding of the scope of the right, see Part III, *infra*.

*Heller* at 2815-16.

In Part III, the *Heller* court stated:

> We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." 307 U.S. at 179, 59 S. Ct. 816. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons." (citations omitted).

*Id*. at 2817.

The *Heller* court also clarified the core of Second Amendment protections:

> We must also address the District's requirement (as applied to respondent's handgun) that firearms in the home be rendered and kept inoperable at all times. This makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional. The District argues that we should interpret this element of the statute to contain an exception for self-defense. (citation omitted)…. The nonexistence of a self-defense exception is also suggested by the D.C. Court of Appeals statement that the statute forbids residents to use firearms to stop intruders, *see McIntosh v. Washington*, 395 A.2d 744, 755-56 (1978).

*Id*. at 2818.

In 2008, the Eighth Circuit first considered the constitutionality of the machine gun ban in *United States v. Fincher*. *United States v. Fincher*, 538 F.3d 868 (8th Cir. 2008). The *Fincher* court applied *Miller* and *Heller* and held that "[machine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use. *Id* at 874.

In 2009, the Sixth Circuit quashed a similar challenge to the Gun Control Act in *Hamblen v. United States*. *Hamblin v. United States*, 591 F.3.d 471 (6th Cir. 2009). The *Hamblen* court discussed *Miller* and *Heller* and held that the right to bear arms does not include the possession of machine guns. *Id*. The *Hamblen* court cited *Heller,* which asserted "that it would be a 'startling' interpretation of precedent to suggest that restrictions on machine guns, set forth in the National Firearms Act, might be unconstitutional." *Id*., citing *Heller*, 554 U.S. 570, 623 (2008).

The Third Circuit then used the *Heller* court's analytical framework to decide a Second Amendment challenge in *Marzzarella*. In *Marzzarella*, a defendant was convicted under the Gun Control Act "for possession of a handgun with an obliterated serial number. *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010). The Third Circuit applied a two-pronged approach. Although the Third Circuit did not reach a conclusion on whether possession of handguns with "obliterated serial number[s]" was protected under the Second Amendment, the court found it dispositive that the Gun Control Act passed constitutional muster under intermediate and strict scrutiny. *Id*. at 101. In part one of the *Heller* framework, the *Marzzarella* court analyzed whether handguns without serial numbers were "dangerous or unusual weapons," which are not protected by the Second Amendment. *Id*. at 92. This case marked the Third Circuit's first major consideration of a Second Amendment challenge to the Gun Control Act and it laid the

framework through which the court would analyze the prohibition of "dangerous and unusual weapon[s]."

In 2012, the Ninth Circuit heard a Second Amendment challenge in *United States v. Henry*. *United States v. Henry*, 688 F.3d 637, 639. The *Henry* court stated that the Second Amendment only protects possession of certain firearms, and explained that the Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns" *Id*. at 640. The Ninth Circuit held that machine guns were "dangerous and unusual" and not commonly used for lawful purposes. *Id*. The *Henry* court further explained:

> A machine gun is "unusual" because private possession of all new machine guns, as well as all existing machine guns that were not lawfully possessed before the enactment of § 922(o), has been unlawful since 1986. Outside of a few government-related uses, machine guns largely exist on the black market. (emphasis added).

*Id*.

In 2016, the Third Circuit heard a Second Amendment challenge to the machine gun ban in *United States v. One Palmetto State Armory*, 822 F.3d 136 (3d Cir. 2016). The Third Circuit noted that *Heller* recognized that the individual right to bear arms is not an unlimited right to possess any firearm anywhere for any purpose (quoting *District of Columbia v. Heller*, 554 U.S. 570, 623, 625, 627 (2008)). The Third Circuit reiterated *Heller's* declaration that Second Amendment protection extends only to certain types of weapons, [specifically] those weapons 'in common use' and not 'those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id*. The Third circuit then cited *Marzzarella* and described its two-pronged approach to Second Amendment challenges:

> "First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." If it does not, the

inquiry ends. If it does, we move on to the second step: "[W]e evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid.

*One Palmetto State Armory*, 822 F.3d at 141.

Under the first prong, the Third Circuit found that the machine gun ban does not burden conduct protected by the Second Amendment. *Id*. The court noted that *Heller* explicitly discussed machine guns and implied that their possession *may be banned* without infringing on the Second Amendment. (emphasis added) *Id*. at 141-42. Relying on *Heller* and *Marzzarella*, the court held that the Second Amendment does not protect the possession of machine guns. They are not in common use for lawful purposes." *See Id. at* 142 (3d. Cir. 2016)

Although *Heller* and its progeny purport to hold that the Second Amendment allows many familiar forms of gun control regulation, the reality is that the *Heller* majority relied on no authority for this proposition, and this authority is only dicta, as pointed out by Justice Breyer in his *Heller* dissent.

## ARGUMENT

Section 922(o), which prohibits the possession of machine guns, is unconstitutional as applied to Mr. Shelton, in light of recent landmark Supreme Court precedent in *New York State Rifle & Pistol Ass'n v. Bruen*, 2022 WL 2251505 (2022), and *Range v. Attorney General United States of America*, 69 F.4th 96 (3rd Cir. 2023). The *Range*[1] court stated

> To preclude Range from possessing firearms, the Government must show that §922(g)(1), as applied to him, "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 2127. Historical tradition can be established by analogical reasoning, which "requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id*. at 2133. To be compatible with the Second Amendment, regulations targeting longstanding problems must be "distinctly similar" to a historical analogue. *Id*. at 2131. But "modern regulations that were unimaginable at the founding" need only be "relevantly similar" to one. *Id*. at 2132. Bruen

---

[1] The *Range* court decided that Range remained one "of the people" protected by the Second Amendment.

offers two metrics that make historical and modern firearms regulations similar enough: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2133.

The *Range* court examined who is among "the people protected by the Second Amendment:

> The Supreme Court referred to "law-abiding citizens" in *Heller*. … the Court reasoned that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. In isolation, this language seems to support the Government's argument. But *Heller* said more; it explained that "the people" as used throughout the Constitution "unambiguously refers to all members of the political community, not an unspecified subset." *Id*. at 580. So the Second Amendment right, *Heller* said, presumptively "belongs to all Americans."

The *Range* court analyzed the Government's argument thusly:

> At root, the Government's claim that only "law abiding, responsible citizens" are protected by the Second Amendment devolves authority to legislators to decide whom to exclude from "the people." We reject that approach because such "extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label." *Folajtar*, 980 F.3d at 912. And that deference would contravene *Heller's* reasoning that "the enshrinement of constitutional rights necessarily takes certain choices off the table. 554 U.S. at 636; *see also Bruen*, 142 S. Ct. at 2131 (warning against "judicial deference to legislative interest balancing").

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court stated that the Second Amendment protects the "law-abiding, responsible" citizen's possession of arms for the "lawful purpose of self-defense." *Id*. at 630, 635; *see also McDonald v. City of Chicago*, 561 U.S. 742, 767-68 (2010). Later, in *New York State Rife & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), the Court held that the Second Amendment further protects the right of "ordinary, law abiding citizens" to carry a handgun for self-defense outside the home." *Id*. at 2122, *Bruen* held

that a restriction on firearm possession is valid only if "it comported with history and tradition," *id*. at 2128, and stated:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation… the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

Id. at 2126 (quoting *Konigsberg v. State Bar of California*, 366 U.S. 36, 49 n. 10 (1961)). *See also Range*, 69 F. 4th at 100-01.

As pointed out by the Court in *Bruen*, the cornerstone of the Second Amendment is self-defense. This Court, in denying Mr. Shelton's request for a jury instruction on Justification, stated in its February 8, 2023 Opinion that, "District Courts within the Third Circuit have widely rejected this and similar argument:

> Even if Mr. Shelton had been able to satisfy the first and third elements of the justification defense, which he has not, the Court has not located any case law indicating that the defense is available at all with respect to the charge in Count 2 of the indictment, specifically, possession of a machinegun in violation of 18 U.S.C. 922(o). This makes sense because unlike 922(g)(1), which prohibits a class of persons, specifically individuals with a "prior felony conviction, from possessing a firearm, 922(o) prohibits anyone, even law-abiding individuals, from possessing a machinegun. Consequently, it would be nonsensical for there to be an exception for "justified' possession of a machinegun.

*See* 2/8/23 Opinion at 10, fn 2.

> Finally, Mr. Shelton's reliance on the Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022) is misplaced. He argues that *Bruen* supports the proposition that "[a]t a minimum, § 922(g)(1) is unconstitutional if it is not subject to a meaningful ability to raise a justification defense," emphasizing that the Supreme Court recognized that "individual self-defense is the 'central component' of the Second Amendment right." ECF No. 131 at 6 (citing *Bruen*, 142 S. Ct. at 2133). District Courts within the Third Circuit had widely rejected this and similar arguments.

*Id*. at 11, citing *United States v. Minter*, No. 3:22-CR-135, 2022 WL 10662252 (M.D. Pa. Oct. 18, 2022), and other cases citing *Minter*.[2]

The *Heller* court stated that the Second Amendment, "is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller* at 2816. Nor did Mr. Shelton possess the Glock switch for any purpose beyond self-defense, and defense of his family, as made clear during the early February evidentiary hearing.

At his February 2023 evidentiary hearing, Mr. Shelton and his sister testified that Mr. Shelton possessed and used the firearm in question for self-defense on numerous occasions. 2/2/23 N.T. at 6-8, 50-51. Mr. Shelton explained that he feared for his life because a statement to federal law enforcement officers was leaked publicly, and that this caused a significant threat in his life moving forward. 2/2/23 N.T. at 29-32. Pittsburgh Police Detective Song testified that his investigation revealed that Mr. Shelton's firearm, each instance it was used, was fired after initially being fired upon. *Id*. at 22-23, 38-39. Besides possessing a firearm strictly for the purpose of self-defense, Mr. Shelton was complying with the conditions of his supervised release, as confirmed by probation officer Tara Kessler. *Id*. at 105-107. Mr. Shelton was holding down a job, a demonstrable improvement and break from his previous lifestyle. *Id*. at 35-36, 48-49. Mr. Shelton did have a possible job opportunity in California, but that wasn't allowed because of his supervision in the Western District of Pennsylvania. *Id*. at 53. Mr. Shelton did not have a choice with regard to the firearm he obtained. He obtained the firearm in question that belonged to one of his friends that had recently passed away. *Id*. at 63.

Mr. Shelton recognizes the tension in his argument with precedent, especially since the government may subject persons subject to criminal terms while on release subject to

---

[2] *Range* abrogates current Third Circuit jurisprudence. *Range* at 10.

conditions of probation from possessing firearms during that time. *United States v. Shaw*, Crim. No. 22-1, 2023 WL 3619416, at 4-7 (D.D.C. May 24, 2023). However, Mr. Shelton asserts that the Nation's historical tradition of regulating machine guns is insufficient to overcome the Second Amendment's unqualified command, *Bruen* at 2126, especially in light of the fact that the demonstrated purpose for Mr. Shelton in possessing the firearm in question was for self protection, the very core of Second Amendment interpretation. Additionally, as noted by Judge Kraus in her *Range* dissent, "the inclusion of that condition among state or federal conditions of release now appears to be unconstitutional as to any number of defendants, depending on whether the judge at the bail or sentencing hearing views them as "like Range." Judge Kraus *Range* dissent, at 44.

Further, the machine gun ban rests on a faulty logical foundation. Second Amendment commentators have seized upon this fact. In 2009, Professor Michael P. O'Shea noted:

> "since restrictive firearms legislation influences which firearms will be found "in common use" by law-abiding private citizens, a constitutional rule that uses the presence or absence of particular arms in common use as a gauge of the constitutionality of firearms legislation runs a serious risk of harmful circularity."

*See* O'Shea, *The Right to Defensive Arms After District of Columbia v. Heller*, at 381 (2009). *See also*, Posner, Richard, *In Defense of Looseness: The Supreme Court and Gun Control*, NEW REPUBLIC, Aug. 27, 2008, at 32, 34 (observing that the reach of the *Heller* opinion is up for grabs).

According to Dave Kepol, in his article *The Founders Were Well Aware of Continuing Advances in Arms Technology:*

> In short, the Founding generation was familiar with tremendous advances in firearms technology. In the American colonial experience, the rate of fire for an ordinary firearm had quintupled. As of 1791, repeating firearms capable of firing 16 or 22 shots had been demonstrated, but they were much too expensive for ordinary citizens. The Madison-Monroe administration's wise industrial policy,

continued under future administrations, led the way towards the mass production of high quality firearms at low prices. No one in 1791 or 1815 could have foreseen all the firearms innovations of the 19th century. We do know that the American federal government did all it could to make those innovations possible.

In *The Federal Circuits' Second Amendment Doctrines*, Kepol stated:

> Historically, machine guns have always been rare in the hands of law-abiding citizens, partly because of the enormous cost of ammunition. When they were introduced to the U.S. market in the 1920s, they were a commercial failure for law-abiding citizens, although they did become popular with bootleggers. However, in compliance with the NFA system, over a hundred thousand machine guns were lawfully possessed by citizens as of 1986, when Congress enacted a statute prohibiting sales to citizens of machine guns manufactured after May 19, 1986. This led the Ninth Circuit to adopt the circular argument that the machine gun prohibition is constitutional because machine guns are prohibited:
>
>> A machine gun is "unusual" because private possession of all new machine guns, as well as all existing machine guns that were not lawfully possessed before the enactment of § 922(o), has been unlawful since 1986. Outside of a few government-related uses, machine guns largely exist on the black market.

*See* Kepol at 235, citing *Henry*, 688 F.3d 640. This type of reasoning was persuasively criticized by the Seventh Circuit in the *Freidman* case; a prohibition cannot be its own justification. The *Friedman* court noted:

> And relying on how common a weapon is at the time of litigation would be circular to boot. Machine guns aren't commonly owned for lawful purposes today because they are illegal; semi-automatic weapons with large capacity magazines are owned more commonly because, until recently (in some jurisdictions), they have been legal. Yet it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be a source of its own constitutional validity.

*See* Kepol at 235*, citing Friedman*, 784 F.3d at 409.

**CONCLUSION**

Regardless of whether the *Range* case was decided narrowly, as applied to Range, the Third Circuit has provided its analytical framework for how it will analyze Second Amendment

challenges following *Bruen*, which abrogates the Circuit's current Second Amendment jurisprudence. *Range* at 10. Significantly, however, *Range's* dissenting Judges make clear that, despite the *Range* opinion being a narrow one that applied only to *Range*, the opinion's operative effect is that it is precedential.[3]

The machine gun ban at 18 U.S.C. § 922(o) is based on a faulty foundation of circular reasoning, Mr. Shelton possessed the firearm in question for the sole purpose defending himself and his family, and he did not have the ability to choose which firearm he was able to possess. Besides possessing the firearm, Mr. Shelton was a law-abiding citizen at the time, fulfilling his responsibilities with probation. As applied to Mr. Shelton, 922(o) is unconstitutional because it prevents Mr. Shelton, who is one of the People that the Second Amendment protects, was possessing the firearm for the exclusive purpose of self-defense – the core component of the Second Amendment.

WHEREFORE, Mr. Shelton respectfully request that this Honorable Court grant his motion to dismiss the 922(o) charge[4].

Respectfully submitted,

By: */s/ Paul Jubas*
PAUL JUBAS, ESQUIRE
Pa. I.D. No.: 311832

---

[3] In Dissent, Judge Kraus noted, "[a]lthough the majority opinion "describes itself as limited 'to Range's situation, today's opinion is not designated non-precedential as appropriate for a unique individual case, but has precedential status, necessarily reaching beyond the particular facts presented. *See* Judge Kraus *Range* dissent at 4-6, Additional, Judge Schwarts, in her dissent, noted, "[w]hile my colleagues state that their opinion is narrow, the analytical framework they have applied to reach their conclusion renders most, if not all, felon bans unconstitutional." *See generally*, Schwartz Dissent.

[4] In the event that 922(o) is held to be unconstitutional by this Court, Mr. Shelton respectfully requests leave to file Motions to Dismiss 922(g)(1) Charge, as well as a Motion for Reconsideration of This Court's Denial of a Justification Instruction. In this Court's 2/8/23 Opinion, the Court relied on *United States v. Minter*, No. 3-22-CR-135, 2022 WL 10662252 (M.D. Pa. Oct. 18, 2022). As noted by the *Range* Court, *Bruen* abrogated the Third Circuit's Second Amendment jurisprudence. *Range* at 10. Therefore, if Mr. Shelton's 922(o) charge were to be held unconstitutional, it is likely that the Court would have to undertake a different Justification defense analysis.

PAUL JUBAS LAW, P.C.
506 Peebles St.
Pittsburgh, PA 15221
(412) 230-0023
pjubasesq@gmail.com

*Counsel for Mr. Shelton*