IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 21-216 |
| | ) | |
| ORONDE SHELTON | ) | |

GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTIONS TO
WITHDRAW GUILTY PLEA AND TO DISMISS THE CHARGES AGAINST HIM

AND NOW, comes the United States of America, by and through Eric G. Olshan, United States Attorney for the Western District of Pennsylvania, and Barbara K. Doolittle, Assistant United States Attorney for said district, and respectfully files the following Response to the defendant's Motion to Withdraw Guilty Plea (Doc. No. 176), his Motions to Dismiss the two counts upon which he has been indicted and to which he pled guilty (Doc. Nos. 175 and 177).

Mr. Shelton argues that 18 U.S.C. § 922(g)(1), which prohibits the possession of firearms by convicted felons, and 18 U.S.C. § 922(o), which prohibits the possession of machineguns, are unconstitutional as applied to him under the Second Amendment and the Third Circuit's decision in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc).  As a result, he claims that the charges against him should be dismissed.  For the reasons set forth below, including his status as a federal supervised releasee and his lengthy, violent, and dangerous criminal history, both of these challenges are incorrect, and this Court should deny Mr. Shelton's motions in their entirety.

1.    **Because Mr. Shelton Raises an As-Applied Challenge, He Bears the Burden of Advancing Factual Evidence to Show that His Conduct Was Constitutionally Protected.**

Because Mr. Shelton challenges §§ 922(g)(1) and 922(o) *as applied to his conduct*, he bears the burden of advancing evidence about his specific circumstances – such as his personal history and the purpose of his firearm possession – because he must show that the Second

1

Amendment protects his specific conduct.  "An as-applied attack . . . does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right."  *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010); *see also, e.g.*, *Tineo v. Attorney General*, 937 F.3d 200, 210 (3d Cir. 2019).

This general rule applies in the Second Amendment context.  An "as-applied" Second Amendment challenger must "present facts about himself and his background that distinguish his circumstances from those of persons" historically barred from firearm possession.  *Binderup v. Attorney General*, 836 F.3d 336, 346-47 (3d Cir. 2016) (en banc) (plurality opinion), *abrogated on other grounds by New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022); *accord United States v. Barton*, 633 F.3d 168, 174 (3d Cir. 2011) (Hardiman, J.).  Failing to present such facts may doom an as-applied attack: when a defendant's as-applied Second Amendment challenge relied on "only the allegations in the Indictment," the Third Circuit found that the challenge could not succeed without "further development of the evidentiary record."  *United States v. Huet*, 665 F.3d 588, 601 (3d Cir. 2012), *overruled on other grounds by Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019).

More recent Second Amendment decisions do not change the fact-specific nature of an as-applied challenge.  The Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), was a facial ruling as to all "law-abiding citizens with ordinary self-defense needs" in the State of New York.  *Id.* at 2156.  For its part, *Range* was a civil case in which Bryan Range, the plaintiff, sought "a declaration that § 922(g)(1) violated the Second Amendment as applied to him."  *Range*, 69 F.4th at 99.  Because Range raised an as-applied challenge, the Third Circuit focused on his specific proposed conduct: "to possess a rifle to hunt

and a shotgun to defend himself at home." *Id.* at 103.  The "material facts" of Range's challenge also included details such as the factual circumstances of Range's prior offense, his sentence, the conviction's age, and Range's subsequent conduct. *Id.* at 98-99.

Mr. Shelton could have proceeded just as Bryan Range did, by proactively seeking a declaratory judgment in a civil constitutional suit.  He did not do so, however, and instead has raised his as-applied Second Amendment claim in motions to dismiss and to withdraw his guilty plea *after* his possession of a firearm.  This posture means that the defendant bears the burden to present facts about the circumstances of his firearm possession, because an as-applied challenger must show "that *the acts of his that are the subject of the litigation* fall outside what a properly drawn prohibition could cover." *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 482 (1989); *see also Binderup*, 836 F.3d at 347.  Only if the defendant presents such facts as to his charged conduct does the Government bear the burden of showing that § 922(g)(1), as applied to the defendant, is within the historical traditions of the United States. *Bruen*, 142 S. Ct. at 2126; *Range*, 49 F.4th at 103.

Nothing in the text of Federal Rule of Criminal Procedure 12 exempts Mr. Shelton from the usual burden of offering facts to support his as-applied Second Amendment challenge, or prohibit this Court from considering facts outside the indictment. *See United States v. Huet*, 665 F.3d 588, 601 (3d Cir. 2012)(defendant's as-applied Second Amendment challenge could have involved "a fully developed evidentiary record" beyond the indictment).  Moreover, requiring the defendant to offer such facts also does not violate his right against self-incrimination, because "the Supreme Court has long recognized that that the courts may prevent the use at trial of testimony by a defendant that was necessary for the vindication of a constitutional right." *United States v. Perry*, 788 F.2d 100, 115 (3d Cir. 1988) (defendant's testimony at bail hearing); *see also, e.g.,*

*Simmons v. United States*, 390 U.S. 377, 393-94 (1968) (defendant's testimony in support of Fourth Amendment suppression claim).

Mr. Shelton's as-applied challenge thus requires this Court to consider the specific circumstances of his firearm possession. At least four judges of this Court have taken this approach to post-*Range* as-applied challenges. *See United States v. Jackson*, Crim. No. 22-18, Dkt. No. 113, at 8-9 (W.D. Pa. Oct. 6, 2023) (Stickman, J.) (considering defendant's prior offense conduct and status on state probation and federal supervised release); *United States v. Terry*, Crim. No. 20-43, Dkt. No. 261, at 6-8 (W.D. Pa. Sep. 14, 2023) (Ranjan, J.) (considering defendants' status as "probationers and parolees"); *United States v. O'Connor*, Crim. No. 03-134, 2023 WL 5542087, at *4 (W.D. Pa. Aug. 29, 2023) (Conti, J.) (considering prior offense conduct); *United States v. Law*, Crim. No. 20-341, 2023 WL 5176297, at *1 (W.D. Pa. Aug. 11, 2023) (Bissoon, J.) (considering prior convictions and instant offense conduct of possessing a firearm "while under a federal criminal justice sentence"), *appeal docketed*, No. 23-2540 (3d Cir. Aug. 24, 2023). Several district judges in other courts have agreed, and have considered a defendant's specific criminal history – such as being "a repeat felon who traffics in deadly and illegal controlled substances." *United States v. Reichenbach*, No. 4:22-CR-57, 2023 WL 5916467, at *10 (M.D. Pa. Sep. 11, 2023); *see also, e.g.*, *United States v. Cotton*, Crim. No. 22-471, 2023 WL 6465836, at *4 (E.D. Pa. Oct. 4, 2023); *United States v. Johnson*, Crim. No. 23-77, 2023 WL 6321767, at *3 (E.D. Pa. Sep. 27, 2023); *United States v. Minter*, No. 3:22-cr-135, 2023 WL 6051265, at *4 (M.D. Pa. Sep. 15, 2023); *United States v. Blackshear*, Crim. No. 23-159, 2023 WL 5985284, at *3 (E.D. Pa. Sep. 14, 2023); *United States v. Ames*, Crim. No. 21-178, 2023 WL 5538073, at *1, 3 (E.D. Pa. Aug. 28, 2023).[1]

---

[1] As those rulings show, the caselaw does not support the outlier decisions of the Middle District

## 2.   Under *Range*, § 922(g)(1) Is Consistent with the Second Amendment as Applied to Mr. Shelton's Firearm Possession.

Here, the defendant's specific circumstances are very different from those in *Range*, and § 922(g)(1) does not violate the Second Amendment as applied to his charged conduct of possessing a firearm. *Range* considered an as-applied challenge to § 922(g)(1) by a civil plaintiff who had previously been convicted of the Pennsylvania misdemeanor of making a false statement to obtain food stamps, and who sought an injunction and a declaratory judgment "that § 922(g)(1) violate[d] the Second Amendment as applied to him." 69 F.4th at 99. The en banc Third Circuit agreed that § 922(g)(1) could not constitutionally be applied to that particular plaintiff. *Id.* at 106. The Government maintains that *Range* (the only circuit court decision that has found that the Government did not carry its burden to demonstrate § 922(g)(1)'s constitutionality as applied to a prohibited person) was wrongly decided and preserves all arguments in support of that position.[2]

---

of Pennsylvania in *United States v. Quailes*, Crim. No. 1:21-CR-176, 2023 WL 5401733 (M.D. Pa. Aug. 22, 2023), *appeal docketed*, No. 23-2533 (3d Cir. Aug. 24, 2023), and *United States v. Harper*, Crim. No. 1:21-CR-236, 2023 WL 5672311 (M.D. Pa. Sep. 1, 2023), *appeal docketed*, No. 23-2604 (3d Cir. Sep. 6, 2023). Considering an as-applied Second Amendment challenge to an indictment, *Quailes* and *Harper* considered only the defendant's general conduct of "possession of a firearm," and ruled that details such as "status as a state parolee" are "irrelevant" under *Range*. *Quailes*, 2023 WL 5401733, at *8-9; *see Harper*, 2023 WL 5672311, at *8-9. But that conclusion misunderstands the nature of as-applied challenges. *E.g.*, *Huet*, 665 F.3d at 601. Ignoring *Perry* and *Simmons* (discussed above), *Quailes* also wrongly ruled that the defendant had no burden to support his challenge with factual evidence because doing so could incriminate himself. *Id.* at *8; *cf. Harper*, 2023 WL 5672311, at *8-9.

[2] In *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023), the Eighth Circuit recently held that § 922(g) is valid as applied to a person who had previously committed any felony. In *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), the court held that 18 U.S.C. § 922(g)(8), which prohibits possession of firearms by someone subject to a domestic violence restraining order, is constitutionally invalid. *Rahimi*, however, distinguished such an order, which rests only on a civil finding, from a felony conviction that traditionally has permitted firearm dispossession. *See id.* at 452. Further, the Supreme Court has granted the Government's petition for certiorari to review the decision. *United States v. Rahimi*, --- U.S. ---, 2023 WL 4278450 (June 30, 2023).

As will be discussed, while *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), abrogated the second "means-end scrutiny" step of the Second Amendment framework that courts had often applied previously, many courts before *Bruen* had rejected challenges to felon-possession prohibitions without relying on means-end scrutiny. The D.C.

The Government has now filed a petition for certiorari in *Range*, asking the Supreme Court to hold *Range* pending a decision in *Rahimi*.  But even on its own terms, *Range* is fully distinguishable from this case.

Most obviously, the Third Circuit emphasized in *Range* that its decision was a "narrow one," applicable only to the exceptional circumstances of a civil plaintiff who had one prior conviction for making a false statement to obtain food stamps.  *Id.* at 106.  The decision's historical analysis was also limited "to Range and his individual circumstances," to "Range's situation," and to "people like Range."  *Id.* at 105, 106; *see also id.* at 110 (Ambro, J., concurring) (explaining that *Range* "speaks only to [Range's] situation, and not to those of murderers, thieves, sex offenders, domestic abusers, and the like"); *id.* at 112 (Range "stands apart from most other individuals subject to § 922(g)(1)").  *Range* did not hold that § 922(g)(1) violates the Second Amendment as applied to every convicted felon, let alone a person in Mr. Shelton's circumstances.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  In *District of Columbia v. Heller*, the Supreme Court stated that the Second Amendment protects the "law-abiding, responsible" citizen's possession of arms for the "lawful purpose of self-defense." 554 U.S. at 630, 635; *see also McDonald v. City of Chicago*, 561 U.S. 742, 767-68 (2010).  Later, in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), the Court held that

---

Circuit "look[ed] to tradition and history" to conclude that "those convicted of felonies are not among those entitled to possess arms," "reject[ing] the argument that non-dangerous felons have a right to bear arms."  *Medina v. Whitaker*, 913 F.3d 152, 157-61 (D.C. Cir. 2019); *see also, e.g.*, *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) (per curiam); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009).  The same is true of scores of district court decisions, both before and after *Bruen*, that have upheld § 922(g)(1) in the face of Second Amendment challenges.  *See, e.g.*, *United States v. Hampton*, 2023 WL 3934546, at *10-12 (S.D.N.Y. June 9, 2023).

the Second Amendment further protects the right of "ordinary, law-abiding citizens" to "carry a handgun for self-defense outside the home." *Id.* at 2122. *Bruen* held that a restriction on firearm possession is valid only if "it comported with history and tradition," *id.* at 2128, and stated:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, . . . the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2126 (quoting *Konigsberg v. State Bar of California*, 366 U.S. 36, 49 n.10 (1961)); *see also Range*, 69 F.4th at 100-01.[3]  Under *Bruen*, the Court must assess whether the defendant is "part of 'the people' whom the Second Amendment protects," whether the weapon at issue is "'in common use' today for self-defense," and whether the "proposed course of conduct" falls within the Second Amendment. *Id.* at 2134-35. If so, the Court turns to the historical inquiry. *Id.* at 2130. *Bruen* clarified that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* at 2127.

Bruen offered guidance on how courts should "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131. The Court stated that the "historical inquiry that courts must conduct will often involve reasoning by analogy" to determine "whether the two regulations are 'relevantly similar.'" *Id.* at 2132 (quoting Cass Sunstein, "On Analogical Reasoning," 106 *Harv. L. Rev.* 741, 773 (1993)). *Bruen* stated that "*Heller* and *McDonald* point toward at least two metrics" that may "render regulations relevantly

---

[3]  *Bruen* struck down a New York law that required residents to demonstrate "proper cause" to obtain a license to carry a handgun outside the home on the ground that the law was not supported by "th[e] Nation's historical tradition of firearm regulation." *Id.* at 2122, 2126.

similar under the Second Amendment": "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 2133.  This historical test focuses on the "burden on the right of armed self-defense," *id.*, and explicitly distinguishes a "law-abiding" person's possession of a firearm for "self-defense" from the possession of a firearm by other persons or for other purposes.  The Supreme Court thus recognized in *Bruen* – as it has on other occasions – that the Second Amendment permits Congress to disarm individuals who are not "law-abiding, responsible citizens."  *Heller*, 554 U.S. at 635; *see generally* Brief for the United States, *United States v. Rahimi*, No. 22-915, 2023 WL 5322645, at *10-27 (U.S. Aug. 14, 2023).

*Bruen* also made clear that its historical inquiry was not "a regulatory straightjacket."  142 S. Ct. at 2133.  "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*."  *Id.*  In some circumstances, "the lack of a distinctly similar historical regulation" may be "relevant evidence" that a statute violates the Second Amendment – but *Bruen* did *not* state that such a "distinctly similar" regulation is *required* to show a statute's constitutionality.  *Id.* at 2131.[4]  On the contrary, *Bruen* observed that "courts can use analogies to [the] historical regulations of 'sensitive places'" such as legislative assemblies, polling places, and courthouses (even though those historical regulations were "relatively few") "to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible."  *Id.* at 2133.

---

[4] For the same reason, *Bruen* did not create a two-tiered historical approach that requires a "distinctly similar" regulation in the case of "a general societal problem that has persisted since the 18th century," but only a "relevantly similar" analogue for "unprecedented social concerns." 142 S. Ct. at 2131, 2132.  The Court did not explain any difference between "distinctly" and "relevantly" similar, or describe those concepts as separate tests. *See id.* at 2131-34.  And although *Bruen* itself considered a persistent problem, it still conducted a detailed review of English and American history for relevantly similar analogues.  *See id.* at 2131-32.  Indeed, because *Bruen* rejected the predominant Second Amendment methodology applied by lower courts, the opinion surely would have been explicit about any new methodological requirements it was creating.

*Bruen* rejected the challenged New York law, which restricted public carry by all citizens in all areas outside the home, because the Court found that no early regulations were relevantly similar at all – not because the Court applied a stricter test. *See, e.g.*, *id.* at 2133-34, 2142, 2145.

Here, the test of *Bruen* and *Range* shows that § 922(g)(1) is constitutional as applied to the defendant. Under *Range*, Mr. Shelton is part of "the people" within the meaning of the Second Amendment. Nevertheless, the Second Amendment does not help Mr. Shelton for at least two separate, independent reasons. First, he was barred from possession of firearms while on federal supervised release. Second, even under *Range*, the bar on firearm possession for offenders such as Mr. Shelton, who has multiple convictions for drug trafficking and other violent, dangerous offenses, is consistent with the Second Amendment based on the historical test outlined in *Bruen*. And third, he has tried but failed to demonstrate that he possessed the firearm in question for lawful self-defense.

**1. First,** even under *Range*, Mr. Shelton had no Second Amendment right to possess a firearm while on federal supervised release, as he was at the time of the charged conduct. As then-Judge Barrett explained, at the time of the Founding, "the rights of felons" were at least "*suspended* during the term of the sentence," even if they sometimes might revive at a point after the sentence expired. *Kanter v. Barr*, 919 F.3d 437, 461 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2127. And even *Range* agreed that "two metrics" for evaluating the constitutionality of firearms regulations are "'how and why the regulations burden a law-abiding citizen's right to armed self-defense.'" 69 F.4th at 103 (quoting *Bruen*, 142 S. Ct. at 2133). Consistently, *Heller* referred to the right of "law-abiding, responsible citizens" to keep firearms for self-defense, 554 U.S. at 626, and *Bruen* repeatedly emphasized "law-abidingness" as a limitation on the Second Amendment's reach. *E.g.*,142 S. Ct. at 2122, 2125, 2131, 2133-34,

2135 n.8, 2138 n.9, 2150, 2156.  By definition, persons serving criminal sentences are not law-abiding, responsible citizens.

There thus can be no question that the government may restrict persons subject to criminal sentences – whether serving time in prison, or released subject to conditions of probation, parole, or supervised release – from possessing firearms during that time.  *E.g.*, *United States v. Shaw*, Crim. No. 22-1, 2023 WL 3619416, at *4-7 (D.D.C. May 24, 2023); *see id.* at *7 ("[A]ny Second Amendment right applicable here may be limited during the period of probation, just as other myriad constitutional rights are.").  Supervised release is a form of punishment that involves restrictions on liberty.  *See, e.g.*, *Gall v. United States*, 552 U.S. 38, 48 (2007).  Defendants on federal supervised release are like probationers, who "do not enjoy 'the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions,'" which are "meant to assure . . . that the community is not harmed by the probationer's being at large."  *Griffin v. Wisconsin*, 483 U.S. 874-75 (1987) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)).  For that reason, even under *Range*, there is "a longstanding historical tradition of depriving people like [Mr. Shelton] of their firearms."  69 F.4th at 106; *see also Terry*, Crim. No. 20-43, Dkt. No. 261, at 6-8 (rejecting as-applied Second Amendment challenges by defendants who were on probation and parole).  Indeed, the defendant's possession of a gun is one of the violations of the terms of his supervised release and thus one of the subjects of the violation petitions filed at Doc. Nos. 67 and 76 of Criminal No. 09-232.  And Mr. Shelton makes no argument that the Second Amendment protects firearm possession by persons on probation.  *See, generally,* Doc. Nos. 175, 177.  Mr. Shelton's possession of a firearm was not protected by the Second Amendment for this independent reason.

**2. Second,** § 922(g)(1)'s ban on firearm possession by persons who have been convicted of multiple drug trafficking offenses and serious, dangerous crimes such as aggravated assault, involuntary manslaughter, harassment and stalking, and unlawful firearm possession is consistent with the Second Amendment. *Bruen* established that the Government may justify a restriction "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2130. The question to address is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id*. at 2133.

*Heller*, *Bruen*, and other recent Supreme Court decisions about the Second Amendment confirm – as does *Range* – that § 922(g)(1) may constitutionally be applied to those convicted of dangerous and serious felonies. In affirming the right of "law-abiding, responsible citizens" to keep firearms for self-defense, *Heller* made clear that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited," 554 U.S. at 626, and that "nothing in [its] opinion should be taken to cast doubt" on certain "presumptively lawful regulatory measures," such as "longstanding prohibitions on the possession of firearms by felons," *id*. at 626-27 & n.26. The Third Circuit later ruled, in line with other Courts of Appeals, that "*Heller*'s list of 'presumptively lawful' regulations is not dicta." *Barton*, 633 F.3d at 171.

*Bruen* thus repeatedly emphasized a person's "law-abiding" nature as a condition of the Second Amendment's reach. *See* 142 S. Ct. at 2122, 2125, 2131, 2133-34, 2135 n.8, 2138 n.9, 2150, 2156. The *Bruen* Court also stated that it cast no doubt on "shall-issue" firearm-carry licensing schemes that "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding responsible citizens'" – thus signaling that those who are not "law-abiding responsible citizens" may constitutionally be prohibited from bearing arms. 142 S. Ct. at 2138

n.9; *see also Vincent v. Garland*, 80 F.4th 1197, 1201-02 (10th Cir. 2023).  And in two concurring opinions in *Bruen*, three Justices went out of their way to reaffirm *Heller*'s statements that felon dispossession statutes are longstanding and presumptively lawful.  *See* 142 S. Ct. at 2157 (Alito, J., concurring) (noting that the decision does not "disturb[] anything that [the Court] said in *Heller* . . . about restrictions that may be imposed on the carrying of guns"); *id*. At 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (quoting *Heller* and emphasizing that "the Second Amendment allows a 'variety' of gun regulations").

As one judge of this Court has found, "historical analogues which disarmed those who were deemed to 'pose a threat to the orderly functioning of society' are proper historical analogues to § 922(g)(1)."  *United States v. Wise*, Crim. No. 21-511, 2023 WL 6260038, at *6 (W.D. Pa. Sep. 26, 2023) (Hardy, J.) (quoting *Range*, 69 F.4th at 110).  The Second Amendment "codified a right 'inherited from our English ancestors.'"  *Heller*, 554 U.S. at 599 (citing *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)).  In England, a 17th-century statute empowered the government to "seize all arms in the custody or possession of any person" who was "judge[d] dangerous to the Peace of the Kingdom."  Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13.  The use of that statute "continued unabated" after the adoption of the 1689 English Bill of Rights, which expressly guaranteed the right to keep and bear arms.  Diarmuid F. O'Scannlain, "Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms," 95 Notre Dame L. Rev. 397, 405 (2019).

Colonial and early state legislatures likewise disarmed individuals who "posed a potential danger" to others.  *NRA v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012).  Some early laws categorically disarmed entire groups deemed dangerous or untrustworthy, such as those who refused to swear allegiance to the government.  *Id*.; *see, e.g.*, Act

of May 1, 1776, ch. 21, § 1, 1776 Mass. Acts 479; Act of June 13, 1777, ch. 21, § 4, 1777 Pa. Laws 63; Act of May 28, 1777, ch. 3 (Va.), reprinted in 9 William Waller Hening, The Statutes at Large; Being a Collection of all the Laws of Virginia from the First Session of the Legislature, in the Year 1619, at 281-83 (1821).  Other laws called for case-by-case judgments about dangerousness.  *See, e.g.*, Act for Constituting a Council of Safety, ch. 40, § 20, 1777 N.J. Laws 90 (empowering officials to "take from such Persons as they shall judge disaffected and dangerous to the present Government, all the Arms, Accoutrements and Ammunition which they own or possess").  Still other laws disarmed individuals who had demonstrated their dangerousness by engaging in particular types of conduct, such as carrying arms in a manner that spreads fear or terror among the people.  *See, e.g.*, Act for the Punishing of Criminal Offenders, 1692 Mass. Laws 11-12; Act for the Punishing Criminal Offenders, 1696-1701 N.H. Laws 15.

Even the *Range* court recognized that "Founding-era governments disarmed groups they distrusted," such as "Loyalists" and religious dissenters.  69 F.4th at 105.  These were people "who, the political majority believed, would threaten the orderly functioning of society if they were armed."  *Id.* at 111 (Ambro, J., concurring).  As Chief Judge Brann of the Middle District of Pennsylvania recently put it, these disarmament laws have a common theme: "[t]hey were all targeted at groups that lawmakers deemed dangerous and disruptive to society, and were aimed at protecting the public from violence and disorder."  *Reichenbach*, 2023 WL 5916467, at *7. "[L]awmakers have made a reasoned decision that drug traffickers are dangerous and disruptive to society.  Especially so given the well understood connection between drugs, firearms, and deadly violence, which the Supreme Court has described as a 'dangerous combination.'"  *Id.* at *8 (citing *Muscarello v. United States*, 524 U.S. 125, 132 (1998)).  The group of persons convicted of drug trafficking offenses and serious, dangerous crimes such as aggravated assault, involuntary

manslaughter, harassment and stalking, and unlawful firearm possession, would qualify as "distrusted" by society, and thus may be disarmed consistent with the Second Amendment.

Proposals made in state ratifying conventions for the Constitution likewise suggest, under the Founding-era understanding of the right to bear arms, that legislatures may disarm certain categories of individuals – including those whose criminal convictions show them to be dangerous. A proposal presented at the Pennsylvania ratifying convention, for instance, stated that "no law shall be passed for disarming the people or any of them *unless for crimes committed*, or *real danger of public injury* from individuals."  2 Bernard Schwartz, The Bill of Rights: A Documentary History 665 (1971) (emphasis added).   A proposal presented by Samuel Adams at the Massachusetts ratifying convention likewise provided that Congress may not "prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms."  *Id*. at 681 (emphasis added).  *Heller* referred to these proposals and observed that the Pennsylvania proposal was "highly influential" in the drafting of the Second Amendment.  554 U.S. at 604.

Post-ratification practice points in the same direction.  Many States enacted laws requiring "those threatening to do harm" to "post bond before carrying weapons in public."  *Bruen*, 142 S. Ct. at 2148; *see, e.g.*, Mass. Rev. Stat. ch. 134, § 16, 750 (1836); Me. Rev. Stat. ch. 169, § 16, 709 (1840); Mich. Rev. Stat. ch. 162, § 16, 162 (1846).  Those statutes show that individuals who were "reasonably accused of intending to injure another or breach the peace" could properly be subject to firearm restrictions that did not apply to others.  *Bruen*, 142 S. Ct. at 2148-49; *see also* William Rawle, A View of the Constitution of the United States of America 126 (2d ed. 1829).  And the understanding that dangerous individuals could be disarmed persisted after the Civil War.  In 1866, for example, a federal Reconstruction order applicable to South Carolina provided that the "rights of all loyal and well-disposed inhabitants to bear arms will not be infringed," but that "no

disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. 908-909 (1866). At around the same time, the Freedman's Bureau explained that a person "may be disarmed if convicted of making an improper or dangerous use of weapons." *Bruen*, 142 S. Ct. at 2152 (quoting The Loyal Georgian, Feb. 3, 1866, p. 3, col. 4).

All of these sources – as well as the gloss on them in recent Second Amendment decisions – suggest that the Government may properly disarm citizens who have been convicted of a dangerous criminal offense. The Eighth Circuit, conducting a detailed historical review,[5] thus recently concluded "that legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms," and that § 922(g)(1) is consistent with this tradition. *United States v. Jackson*, 69 F.4th 495, 505-06 (8th Cir. 2023), *reh'g en banc denied*, 2023 WL 5605618 (8th Cir. Aug. 30, 2023). Accordingly, *Range* is (as the Third Circuit stated) a "narrow" decision: it holds only that no history or tradition supports disarming "people like Range" – a person who, over 25 years earlier, understated his income on an application for food stamps, resulting in a three-year term of probation. *Range*, 69 F.4th at 106.

Mr. Shelton's criminal history, set forth in his Presentence Investigation Report at Doc. No. 161 and discussed during the February 1-2, 2023 evidentiary hearing, in addition to other violent acts involving the use of a machinegun (Doc. No. 171 at 41-42, 54-56, 61-62), demonstrates that he is unquestionably not "like Range."

Even if Mr. Shelton's prior crimes could not constitutionally support a lifetime ban on firearm possession (which they can), the recency of those offenses certainly showed his danger to the public at the time of his instant offense conduct nearly 11 years later, and while still serving a

---

[5] Judge Krause's dissent in *Range* also presented an exhaustive account of the pertinent history of bans on firearm possession by felons and other dangerous persons. 69 F.4th at 120-28.

term of supervised release for his most recent prior offense.  Mr. Shelton therefore posed a "real danger of public injury" at the time of his firearm possession, 2 Bernard Schwartz, The Bill of Rights: A Documentary History 665 (1971).  For that reason, this Court need not decide in this case whether § 922(g)(1)'s lifetime prohibition on firearm possession is consistent with the Second Amendment, in order to find that the defendant could, consistent with the historical right to bear arms, be disarmed at the time of his firearm possession in this case.

Thus, even under *Range*, a person with Mr. Shelton's criminal history is the kind of dangerous person who has historically been disarmed.  Convicted drug dealers and violent offenders would "threaten the orderly functioning of society if they were armed." 69 F.4th at 111 (Ambro, J., concurring); *see, e.g. Jackson*, 69 F.4th at 498, 501 (affirming district court's holding that "§ 922(g)(1) is not unconstitutional as applied to [a non-violent drug offender] based on his particular felony convictions" for drug trafficking).  Barring the possession of firearms by such persons is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127.

Several judges of this Court have already denied as-applied *Range* challenges to § 922(g)(1) and rejected many of the arguments Mr. Shelton makes here.  *See United States v. Jones*, Crim. No. 20-21, Dkt. No. 165 (W.D. Pa. Oct. 6, 2023) (Bissoon, J.); *Jackson*, Crim. No. 22-18, Dkt. No. 113, at 8-9; *Wise*, 2023 WL 6260038, at *6; *United States v. Hilliard*, Crim. No. 23-110, Dkt. No. 59 (W.D. Pa. Sep. 21, 2023) (Ranjan, J.); *Terry*, Crim. No. 20-43, Dkt. No. 261, at 6-8; *United States v. Blair*, Crim. No. 17-153, Dkt. No. 279 (W.D. Pa. Aug. 28, 2023) (Cercone, J.); *Law*, 2023 WL 5176297, at *1; *see also O'Connor*, 2023 WL 5542087, at *4 (defendant made only a facial challenge, but as-applied challenge "would likely not succeed").  As those decisions emphasize, "[t]he holding in *Range* 'was a narrow one'" limited to "'people like Range.'" *Blair*,

Crim. No. 17-153, Dkt. No. 279 at 1 (quoting *Range*, 69 F.4th at 106).  And "the predicate crime addressed in *Range* is clearly and facially distinguishable" from more serious predicate convictions.  *Law*, 2023 WL 5176297, at *1; *see also United States v. Irizarry*, Crim. No. 21-202, 2023 WL 6406278, at *4 (E.D. Pa. Oct. 4, 2023); *O'Connor*, 2023 WL 5542087, at *4 .  Like the defendants in those cases, the defendant cannot succeed in his as-applied Second Amendment challenge.

3. **Third,** Mr. Shelton's assertion that he did not possess the firearm in question "for any purpose beyond self-defense, and defense of his family" is invalid.  Doc No. 175 at 8.  During the pendency of this case, Mr. Shelton raised a justification defense, claiming a need to carry a firearm to protect himself, which was litigated in court (*see* Doc. Nos. 170 and 171) and on paper (Doc. Nos. 131 and 132).  Based on the evidence and arguments, this Court decided that the defendant could not satisfy two of the four elements requisite for establishing that he possessed the machinegun in self-defense.  Doc. No. 147 at 6.  The Court's decision further rejected the defendant's argument that *Bruen* changes this calculus.  *See* Doc. No. 147 at 11 ("the Supreme Court's decision in *Bruen* does not entitle Mr. Shelton to a justification defense that is otherwise unavailable to him.").

Neither does the Third Circuit's decision in *Range* impact the constitutionality of the Court's ruling that Mr. Shelton's firearm possession was unjustified.  As noted above, one of the "material facts" relevant to Range's as-applied challenge was his specific proposed conduct: "to possess a rifle to hunt and a shotgun to defend himself at home."  *Range*, 69 F.4th at 99.  This particular fact is "undisputed" by the *Range* litigants.  *Id.* at 98.  Here, on the contrary, the Court has already found that the defendant cannot establish his conduct – possession of a machinegun "over the course of months" – was for the purpose of self-defense.  *See* Doc. No. 147 at 9, 11.  In

17

short, the self-defense argument is foreclosed to the defendant.  Because he had no lawful purpose for possessing a firearm, and a machinegun specifically, Mr. Shelton is not "like Range": another reason why § 922(g)(1) is not unconstitutional as applied to him.[6]

Whether taken together or independently, all of the above reasons, including Mr. Shelton's status as a supervised releasee, his significant criminal history, and his failure to establish a lawful purpose, show that his offense conduct in this case is not protected by the Second Amendment, even under the Third Circuit's analysis in *Range*.  This Court should thus deny Mr. Shelton's as-applied constitutional challenge to § 922(g)(1).

### 3.   Under *Range*, § 922(o) Is Also Consistent with the Second Amendment as Applied to Mr. Shelton's Firearm Possession.

Mr. Shelton is also incorrect when he argues that 18 U.S.C. § 922(o) violates the Second Amendment.  *See* Doc. No. 175 at 5, 8-12.  The Supreme Court and the Third Circuit have made clear that the Second Amendment's plain text does not cover machineguns, and *Range* has done nothing to disturb this precedent.

In *United States v. Miller*, 307 U.S. 174 (1939), the Supreme Court rejected a Second Amendment challenge by two defendants who were charged with possessing an unregistered short-barreled shotgun.  307 U.S. at 175.  *Miller* held that "we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument," and upheld a law barring their possession.  *Id.* at 178.  In particular, short-barreled shotguns were unprotected by the Second Amendment because they were not "part of the ordinary military equipment" and could not "contribute to the common defense."  *Id.*  Nearly 70 years later, in *Heller*, the Supreme Court affirmed *Miller*, explaining that *Miller*'s "basis for saying that the Second Amendment did not

---

[6] For the same reasons, the self-defense justification for the possession of a machinegun is foreclosed to the defendant with respect to his violation of § 922(o).

apply was . . . that the *type of weapon at issue* was not eligible for Second Amendment protection." 554 U.S. at 622 (emphasis in original).  *Heller* reiterated *Miller*'s holding "that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.  That accords with the historical understanding of the scope of the right."  554 U.S. at 625.  *Heller* also repeated that the Second Amendment allows prohibitions on "dangerous and unusual weapons."  *Id.* at 627.  After *Heller*, the circuits to consider the question have upheld § 5861(d) on the basis that short-barreled firearms are dangerous and unusual weapons unprotected by the Second Amendment.  *See United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018); *United States v. Miller*, 11 F.4th 944, 955 (8th Cir. 2021); *United States v. Wilson*, 979 F.3d 889, 903 (11th Cir. 2020).  And the Supreme Court has made clear that machineguns, like short-barreled firearms, are dangerous and unusual weapons and are unprotected: in its discussion of *Miller*, *Heller* stated that it would be "startling" to conclude that "restrictions on machineguns . . . might be unconstitutional."  554 U.S. at 624.

Far from undermining *Miller* and *Heller*, *Bruen* reaffirmed that "the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,'" not "dangerous and unusual" weapons.  142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627).  In his motion, the defendant points to no data to indicate that such weapons were used by private citizens when the Bill of Rights was enacted.  *See* Doc. No. 75 at 9-10.  Under *Miller* and *Heller*, therefore, he has not demonstrated how the plain text of the Second Amendment covers his possession of machineguns as firearms "in common use at the time" by private citizens.  In any event, both concurrences in *Bruen* emphasized the narrow scope of its holding.  Justice Alito, concurring, wrote that "our holding decides nothing about who may lawfully possess a firearm. Nor have we disturbed anything that we said in *Heller* or [*McDonald v. City of Chicago, Ill.*, 561 U.S. 742

(2010)] about restrictions that may be imposed on the possession or carrying of guns." 142 S. Ct. at 2157. Justice Kavanaugh, joined by Chief Justice Roberts in a separate concurring opinion, noted that as the Supreme Court had previously explained in *Heller* and *McDonald*, "the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check" and that "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id.* at 2162 (quoting *Heller*, 554 U.S. at 636).

Multiple courts, including the Third Circuit, have relied on *Heller* to conclude that machineguns fall outside the Second Amendment's scope. *See, e.g., United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d 136, 141-44 (3rd Cir. 2016) (finding "the Second Amendment does not protect the possession of machine guns. They are not in common use for lawful purposes."); *Kolbe v. Hogan*, 849 F.3d 114, 135-37 (4th Cir. 2017) (holding semi-automatic assault rifles, like an AR-15 and large-capacity magazines which are most useful in military service, fall outside the Second Amendment); *Hollis v. Lynch*, 827 F.3d 436, 449-51 (5th Cir. 2016) (finding that machineguns do not receive Second Amendment protection because they are dangerous and unusual); *Hamblen v. United States*, 591 F.3d 471, 473-74 (6th Cir. 2009) (finding the right to keep and bear arms does not authorize an unlicensed individual to possess unregistered machine guns for personal use); *United States v. Fincher*, 538 F.3d 868, 873-74 (8th Cir. 2008) (finding machineguns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use); *United States v. Henry*, 688 F.3d 637, 639-40 (9th Cir. 2012) (finding that short of bombs, missiles, and biochemical agents, few weapons are more dangerous than machineguns and thus the Second Amendment does not apply.).

In *One PA-15 Machinegun Receiver/Frame*, the Third Circuit points out that *Heller* "discusses machine guns on several occasions, and each time suggests that these weapons may be banned without burdening Second Amendment rights." 822 F.3d at 141. Further, under *Heller*, a categorical ban on a particular type of bearable arm would not be unconstitutional. *Id.* at 144. Because machineguns are "exceedingly dangerous weapons" which are "not in common use for lawful purposes," "the possession of a machine gun is not protected under the Second Amendment" and "§ 922(o) does not burden conduct falling with the [Amendment's] scope." *Id.* at 142-44.

To the extent Mr. Shelton asserts that he cannot be prohibited from possessing a machinegun based on *Range*'s inclusion of all Americans as part of "the people" protected by the Second Amendment, his proposition should be rejected. *Range* focused on who could possess a firearm, whereas the focus of this inquiry is on how a person may possess a firearm. *See United States v. Cash*, No. 22-2713 at *5, n.6 (3d Cir. Oct. 6, 2023) (unpublished) (citing *Range*, 69 F.4th at 100, 103 (distinguishing among "'who,' 'what,' 'where,' 'when,' and 'how' restrictions" and considering separately whether *Range* was part of "the people" and whether his conduct was protected by the Second Amendment). Thus, *Range* does not directly address the question here. *See id.*

Because *Bruen* did not upset *Miller*'s and *Heller*'s clear holdings, the Government need not point to a historical tradition of regulating machineguns. But in any event, § 922(o) is in fact consistent with the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627. Under English common law, "the offence of riding or going armed, with dangerous or unusual weapons, [was] a crime." 4 William Blackstone, *Commentaries on the Laws of England* 148 (1769); *see* 1 William Hawkins, *Pleas of the Crown*, 135 (1716)

21

("[T]here may be an Affray where there is no actual Violence, as where a Man arms himself with dangerous and unusual Weapons, in such a matter as will naturally cause Terror to the People."). In the United States, too, courts have long acknowledged that a man commits "an offence at common law" when he "arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." *State* v. *Langford*, 3 Hawks 381, 383 (N.C. 1824). For that reason, the Second Amendment encompasses only arms "of the kind in common use." *Heller*, 554 U.S. at 624 (quoting *Miller*, 307 U.S. at 179). *Bruen* did not change this aspect of *Heller*. Instead, *Bruen* reaffirmed *Heller*'s finding there is a "fairly supported" "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Bruen*, 142 S. Ct. at 2128 (citing 4 W. Blackstone, Commentaries on the Laws of England at 148-149: Miller, 307 U.S. at 179).

In light of *Heller*'s conclusion that our nation's historical tradition includes regulating dangerous and unusual firearms—a conclusion rooted in a variety of historical resources wholly unrefuted by defendant—and the Third Circuit's holding that machineguns are "exceedingly dangerous weapons" which are "not in common use for lawful purposes" (*One PA-15 Machinegun Receiver/Frame*, 822 F.3d at 142), this Court should reject defendant's constitutional challenge to § 922(o) on historical grounds, if it does not already conclude that the plain text of the Second Amendment does not cover the possession of machineguns.

### 4.      Mr. Shelton's Motion to Withdraw His Guilty Plea Should Be Denied.

Mr. Shelton asserts that he should be permitted to withdraw the guilty plea he entered before this Honorable Court on February 16, 2023. On that date, he admitted that he unlawfully possessed a firearm and ammunition as a convicted felon and that he unlawfully possessed a machinegun. Mr. Shelton now claims that he "has continually asserted his innocence," "paradigm shifting precedent has come down from the Third Circuit," and "the Government will not be prejudiced by withdrawal" of his plea. Doc. No. 176. Therefore, according to Mr. Shelton, he has

a fair and just reason for the withdrawal, notwithstanding his previous admission of guilt.  *Id.*  "In determining whether the defendant has a 'fair and just reason' to withdraw the plea, we consider three factors: whether the defendant asserts his innocence, the strength of the defendant's reasons for withdrawing the plea, and whether the government would be prejudiced by the withdrawal." *United States v. Hill-Johnson*, 806 Fed.Appx. 114, 117 (3d Cir. 2020)(citing *Jones*, 336 F.3d at 252).   The defendant's motion should be denied, as he fails to satisfy his "substantial" burden. *See United States v. Jones*, 336 F.3d 245, 252 (3d Cir. 2003).

Oronde Shelton is neither factually nor legally innocent of violating 18 U.S.C. §§ 922(g)(1) and 922(o).   The defendant testified at an evidentiary hearing on February 2, 2023, and again at his change of plea hearing, that he did in fact possess the machinegun in question and that he had in fact been convicted of crimes precluding his lawful possession of a firearm.  *See, e.g.*, Doc. No. 171 at 54-55, 65-66, 70.   These very admissions "belie[] his assertion that he is 'factually innocent.'"   *See United States v. Cormier*, 758 Fed.Appx. 269 (3d Cir. 2018).   As to legal innocence, this Court has already ruled that because Mr. Shelton "cannot establish that he was under a present threat of harm" and "failed to establish that he had no legal alternative to possessing the firearm", he "is not entitled to present a justification defense."  Doc. No. 147 at 7, 9, 11.   That is to say, the issue of whether Mr. Shelton was justified in possessing the machinegun with which he is charged has already been exercised and he did not prevail.   Because the defendant did not "establish, by a preponderance of the evidence, that he acted in self-defense or otherwise possessed the gun for a legally defensible reason," he "fail[s] to meet his 'substantial' burden of demonstrating innocence."   *See Cormier*, 758 Fed.Appx. at 274, 275.

The basis of Mr. Shelton's desire to withdraw his plea is the change in Third Circuit law brought about by the en banc decision in *Range*.   For all of the reasons set forth above, the strength

of this contention is very weak: *Range* in no way undermined precedent holding that machineguns are not covered by the text of the Second Amendment, and the defendant could hardly be more *un*like Range, based on his history and characteristics.

Because Mr. Shelton cannot support his request to withdraw his guilty plea with a strong reason or an assertion of innocence, "[t]he third factor, prejudice to the government, is not reached." *United States v. Robinson*, 427 Fed.Appx. 163, 168 (3d Cir. 2011). "[T]he Government need not show such prejudice when a defendant has failed to demonstrate that the other factors support a withdrawal of the plea." *Jones*, 336 F.3d at 255. Nevertheless, the government points out that this case has been pending for two-and-a-half years, during which time counsel and agents have engaged in extensive preparation for trial – not once, but twice – and pretrial and sentencing litigation.

The government respectfully suggests that the Court stay or hold in abeyance its decision on the Motion to Withdraw Guilty Plea until such time as it resolves the motions to dismiss the charges and determines whether the application of §§ 922(g)(1) and 922(o) are constitutional as applied to Mr. Shelon. Should the Court agree with the government that the defendant's conduct was not constitutionally protected, then the motion to withdraw the guilty plea becomes moot, and should be denied. Should the Court agree with the defendant's argument and find that his conduct was constitutionally protected, the Court could then grant the defendant's Motion to Withdraw Guilty Plea in the same memorandum opinion or in a simultaneously issued opinion and/or order.

WHEREFORE, for all of the foregoing reasons, the government respectfully suggests that the Court should deny Oronde Shelton's motions to dismiss the two counts with which he is charged in the Superseding Indictment and to which he has already pled guilty.  The government further respectfully requests that his Motion to Withdraw Guilty Plea be denied.

Respectfully submitted,

ERIC G. OLSHAN
United States Attorney

*s/Barbara K. Doolittle*
BARBARA K. DOOLITTLE
Assistant U.S. Attorney
PA ID No. 204338