IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.                                               Criminal No. 2:21-cr-00216-CCW-1

ORONDE SHELTON

**DEFENDANT'S REPLY TO GOVT'S RESPONSE (ECF NO. 181) TO DEENDANT'S MOTION TO WITHDRAW GUILTY PLEA (ECF NO. 176), MOTION TO DISMISS 922(o) CHARGE (ECF NO. 175), AND MOTION TO DISMISS 922(g)(1) CHARGE (ECF NO. 177)**

AND NOW comes Defendant, Oronde Shelton, by and through his counsel, Paul Jubas, Esq., of Paul Jubas Law P.C., and respectfully files the following Reply to the Govt's Response to Defendant's Motion to Withdraw Guilty Plea (ECF No. 176), and his Motions to Dismiss 922(o) Charge (ECF No. 175) and Motion to Dismiss 922(g)(1) Charge (ECF No. 177).

**Self Defense**

First, Mr. Shelton acknowledges the Third Circuit's that Heller's list of "presumptively lawful" regulations is not dicta." *United States v. Barton*, 633 F.3d at 171. However, since neither the Third Circuit nor the Supreme Court has yet to undertake the historical analysis now required under Second Amendment jurisprudence, Mr. Shelton asserts the position taken by then-Judge Amy Coney Barrett's dissent in *Kanter v. Barr*, "[l]ike the majority, I am reluctant to place more weight on these passing references that the Court itself did. The constitutionality of felon dispossession was not before the Court in Heller, and because it explicitly deferred analysis of this issue, the scope of the assertion is unclear." *Heller* at 453 (cleaned up). In short, the dictum of *Heller* and subsequent Second Amendment cases do not settle the felon disarmament and machinegun bans before us.

1

Next, the Government's Response (ECF No. 176) fails to adequately analyze Second Amendment jurisprudence by 1) failing to discuss this case in terms of self-defense, the cornerstone of the Second Amendment, *see McDonald v. City of Chicago*, 561 U.S. at 767, 130 S.Ct. 3020 (quoting *Heller*, 554 U.S. at 599, 128 S.Ct. 2783); and 2) taking an awkward and/or disingenuous position regarding Mr. Shelton's obvious and demonstrated defense of himself and his family.

The Government highlights this strange position, stating:

> "Third, Mr. Shelton's assertion that he did not possess the firearm in question "for any purpose beyond self-defense, and defense of his family" is invalid. Based on the evidence and arguments, this Court decided that the defendant could not satisfy two of the four elements requisite for establishing that he possessed the machine gun in self-defense. Gov't Reply at 17.

The government oversteps considerably with this argument by conflating the concept of defending oneself with the Third Circuit's exacting legal standard for obtaining a justification jury instruction. First, the government either misrepresents or misunderstands that this Court did not rule that Mr. Shelton was not defending himself. Instead, this Court ruled that Mr. Shelton did not meet the heightened burden of the Third Circuit's test for a justification defense jury instruction in the context of a 922(g) and (o) prosecution. Next, the government's argument that Mr. Shelton was not defending himself and his family is patently absurd. If person A fires at person B without provocation from person B, then person B immediately returns fire, a reasonable implication is that person B was defending themselves. This is plainly what the government's own investigation revealed. With zero evidentiary support in the record for its position that Mr. Shelton was not defending himself, it is difficult to understand exactly how the government has arrived at its faulty conclusion.

**Historical Analysis**

In addition to failing to properly analyze Second Amendment jurisprudence through the primary lens of self-defense, the Government also comes up short with its historical analysis. As stated by Dave Kopel, research director at the Independence Institute, in his Reason article, "The Founders were aware of continuing advances in arms technology,

> "In short, the Founding generation was familiar with tremendous advances in firearms technology. In the American colonial experience, the rate of fire for an ordinary firearm had quintupled. As of 1791, repeating firearms capable of firing 16 or 22 shots had been demonstrated, but they were much too expensive for ordinary citizens. The Madison-Monroe administration's wise industrial policy, continued under future administrations, led the way towards the mass production of high quality firearms at low prices. No one in 1791 or 1815 could have foreseen all the firearms innovations in the 19th century. We do not that the American Federal government did all it could to make those innovations possible."

*See* https://reason.com/volokh/2023/05/26/the-founders-were-well-aware-of-continuing-advances-in-arms-technology/.

Additionally, in his discussion of "*Common Use" and the Problem of New Weapons: The Lever-Action Rifle,* Michael P. O'Shea draws the reader's attention to the absurdity of the Common Use doctrine by reference to the Henry rifle. *See The Right to Defensive Arms after District of Columbia v. Heller*, West Virginia Law Review, Volume 111, Issue 2, 381-386, attached hereto as Exhibit D-1. Developed close to the Civil War, the Henry rifle's lever-action made it one of the first successful repeating rifles to use self-contained metallic cartridge ammunition. According to O'Shea,

> "[The Henry rifle] was a startling weapon: at a time when most infantry troops were issued single-shot, muzzle loading rifles and muskets, the Henry's tubular magazine held a full fifteen cartridges of intermediate-powered .44 rimfire ammunition. The Henry rifle, and its similar contemporary, the .56 Spencer lever-action rifle, represented an enormous increase in personal firepower: the user could fire the rifle, then immediately eject the spent casing and chamber another round, by merely working the lever assembly that was conveniently attached to the rifle's trigger guard."

*Id.* at 381.

O'Shea then described how the Henry rifle directly led to the more efficient and powerful Winchester and Marlin firearms, which he described as "quintessential 'weapons typically possessed by law-abiding citizens for lawful purposes," as Justice Scalia expressed the contours of the Second Amendment's protection in *Heller*. *Id.* at 382.. He then illuminates the discussion with a hypothetical:

> Suppose, counterfactually, that a nineteenth-century congress had sought to ban private citizens from possessing [Henry, Winchester and Marlin firearms]. And suppose Heller was on the books at the time. If late nineteenth-century American judges had shared the same attitudes of many twentieth-century federal judges, it is not hard to imagine them using a grudging application of Heller to uphold these bans against a Second Amendment challenge. The resulting opinions would remark with alarm at the high ammunition capacity and rapid firepower of the new Henry rifles, and their rise to prominence on the military battlefield. Sure, they might reason, these new weapons of war qualify as "dangerous and unusual," and therefore (arguably) fall outside of the protection of the Second Amendment, as construed under Heller. After all, the rifles are certainly "dangerous": all firearms are so; besides, these rifles include technical innovations that increase their effectiveness. And at the time our hypothetical courts are adjudicating this Second Amendment claim, the rifles are indeed 'unusual' in private hands, since they have not long been in production.
> Such decisions would allow legislative bands on repeating rifles to remain in force, and would therefore stifle the growth of any legitimate culture of private ownership of these arms. We might expect a culture to emerge in which Winchester rifles were found solely in the hands of "armed criminals and armed police."

*See*, O'Shea, Michael, *The Right to Defensive Arms after District of Columbia v. Heller*, Vol. 111, Issue 2, January 2009, at 382-383

This hypothetical parallels Mr. Shelton's case. His firearm can be considered as not in common use by law-abiding citizens specifically because it was outlawed by Congress. This country's rich history, dating back to the author of the Second Amendment, of improving the efficiency and firepower of firearms has been demonstrated, as has the machinegun ban's circular logic, whereby machineguns are not in common use because of the prohibition itself.

4

Finally, and most crucially, this Country did not begin regulating machine guns until 1934, with the passage of the National Firearms Act of 1934, a fact that the Government glosses over, due to its patent incompetence to rise to the level of an acceptable historical tradition for purposes of modern Second Amendment jurisprudence.

**Conclusion**

Mr. Shelton proved through testimony and the government's own investigation that he possessed and used the firearm in question for the sole purpose of protecting himself and his family, and self-defense is the cornerstone of Second Amendment jurisprudence. S*ee McDonald v. City of Chicago*, 561 U.S. at 767, 130 S.Ct. 3020 (quoting *Heller*, 554 U.S. at 599, 128 S.Ct. 2783). The hurdle that Mr. Shelton has to get over in order to assert Second Amendment protection is the machine gun ban, which does not have a historical tradition in this country beyond 1934. In fact, this country's historical tradition, even through the author of the Second Amendment, to increase efficiency and firepower of firearms through government programs. Moreover, through circular logic, the machinegun ban prevents these types of firearms from being in "common use" through the operation of the machinegun ban itself.

Neither the historical tradition, nor the circular logic of the machinegun ban support the government's claims. And critically, no matter the intellectual gymnastics the government employs, Mr. Shelton has amply demonstrated that his sole purpose for possessing the firearm was for defense of himself and others.

WHEREFORE, for the foregoing reasons, Mr. Shelton respectfully requests that this Honorable Court grant his Motion to Dismiss 18 U.S.C. § 922(g)(1) and 922(o) Charges, and to stay/hold in abeyance his Motions to Withdraw Guilty Plea.

Respectfully submitted,

By: */s/ Paul Jubas*

PAUL JUBAS, ESQUIRE
Pa. I.D. No.: 311832
PAUL JUBAS LAW, P.C.
506 Peebles St.
Pittsburgh, PA 15221
(412) 230-0023
pjubasesq@gmail.com

*Counsel for Mr. Shelton*